UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In the Matter of the Application of            :
ELLIOTT MADISON AND ELENA MADISON,  :
JAMES WEISS AND IRINA WEISS, JENNIFER :
SOBOLEWSKI, MICHAEL WALLSCHLAEGER, :            **OPINION & ORDER**
and MAIK HASENBANK,                        :            09-mc-647 (DLI)
for an order, pursuant to Rule 41(g) of the Federal :
Rules of Criminal Procedure returning property :
unlawfully seized from the premises 33-28 88th :
Street, Queens, New York, on October 1, 2009. :
------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

This action was initiated on October 2, 2009, pursuant to Federal Rule of Criminal Procedure 41(g). Petitioners seek the return of property they allege was unlawfully seized from their residence pursuant to the execution of certain search warrants or, in the alternative, the appointment of a special master to conduct an initial review of the materials seized. Upon careful consideration of all the parties' arguments, the court hereby denies petitioners' motions in their entirety. Accordingly, the Temporary Restraining Order ("TRO"), initially issued by the court on October 2, 2009 and extended on October 16 and 26, 2009, is lifted, and the government is directed to expedite its review of the seized items as specified below. [1]

## BACKGROUND

The petitioners in this case are Elliot and Elena Madison (collectively, the "Madisons"), Jennifer Sobolewski, Michael Wallschlaeger, James and Irina Weiss (collectively, the "Weisses"), and Maik Hasenbank. The Madisons are self-proclaimed political anarchists who associate with other "like-minded political anarchists." (Elliot Madison Aff. ¶ 13; Madison Memorandum in Support of Special Master at 3 ("Special Master Memo"); Madison Reply

_____

[1] The TRO was lifted by a Preliminary Order on November 2, 2009. (Docket Entry dated November 2, 2009.) The court's directions as to the government's review of the seized items is set forth in the CONCLUSION at pp. 31-32.

Memorandum at 8 ("Madison Reply").)  As part of their political activities, the Madisons have been associated with The Peoples' Law Collective ("PLC"), an organization that provides "legal assistance" to people involved in political demonstrations and protest activity, although it is not staffed by attorneys. (Elliot Madison Aff. ¶ 10; Elena Madison Aff. ¶ 5; Gov't Opp'n Ex. L.) Mr. Madison is employed at Fountain House, a rehabilitation center for people with mental illnesses. (Elliot Madison Aff. ¶ 3.)  Mr. Madison is also a poet and author in, among other genres, anarchist political theory and practice. (*Id.* ¶ 13.)  Mrs. Madison is an urban planner employed by the Project for Public Spaces, a non-profit urban planning and design organization. (Elena Madison Aff. ¶ 3.)  Petitioner Sobolewski is an employee of the National Opinion Research Center ("NORC") at the University of Chicago, an organization that conducts social science research. (Sobolewski Reply at 1.)  Petitioner Wallschlaeger writes and produces an online radio show entitled *This Week in Radical History*. (Wallschlaeger Aff. ¶ 5.)  The Weisses are professional video/photographers and graphic designers. (Weiss Affs. ¶ 4.)  Petitioner Hasenbank is a graduate student at the HFBK Hamburg Art School. (Oral Argument Tr. 40-41.) Hasenbank came to the United States from Germany on September 13, 2009, pursuant to a six-month visa. (*Id.*)  As of October 1, 2009, all the petitioners resided at 33-28 88th Street, Queens, New York (the "Premises"), which is owned by the Madisons and a non-party.

On September 26, 2009, the Honorable Viktor V. Pohorelsky, U.S. Magistrate Judge of this court, issued a search warrant authorizing the search of the Premises ("Warrant").  On October 1, 2009, during the execution of the Warrant, members of the Joint Terrorism Task Force ("JTTF") observed a garage and greenhouse behind the Premises that they believed (based

on reports from neighbors and other evidence) belonged to the residents of the Premises.[2]   That same day, the JTTF agents obtained a second warrant issued by Magistrate Judge Pohorelsky that specifically encompassed the garage and greenhouse (the "Second Warrant").[3]   The Second Warrant also was executed on October 1, 2009.  Each of the Warrants had a Rider attached that described the items to be seized and referenced the federal anti-rioting laws.[4]   The supporting affidavits for both Warrants were filed under seal.

The search of the Premises purportedly lasted approximately sixteen hours and resulted in the seizure of, among other things: fireworks, professional-grade gas masks, gas mask air filters, arm and leg pads, face masks, goggles, a slingshot, test tubes and beakers, jars containing an aggregate weight of nearly one pound of liquid mercury, one box of ammunition, professional-quality walkie-talkies, backpacks containing pick-style hammers and face masks, approximately one dozen caltrops,[5] assorted computers, cameras, cellular phones and other electronic equipment, and assorted books, pamphlets, documents and posters. (Gov't Opp'n at 2; Receipts for Property ("Receipts") attached to Madison Motion for Return of Property ("Madison Motion"); Madison Reply at 3-6.)  The agents did not seize assorted machetes, samurai swords, fencing rapiers, daggers, or workroom tools. (Gov't Opp'n at 2.)

On October 2, 2009, the day after the search, the Madisons initiated this action pursuant to Federal Rule of Criminal Procedure 41(g), seeking the return of all the seized property or, in

---

[2] From this point forward, the "Premises" shall refer to the residence, garage and greenhouse.

[3] From this point forward, the two warrants issued by Magistrate Judge Pohorelsky shall be referred to as the "Warrants" or the "Search Warrants."

[4] *See* 18 U.S.C. § 2101 (2009).

[5] Caltrops are small metal devices with sharp points configured in such a way that one or more points always stick up.  These have been used in warfare as a hazard to pneumatic tires or horses.  *See* The Weider History Group Online, Weaponry: The Caltrop, http://www.historynet.com/weaponry-the-caltrop.htm.

the alternative, the appointment of a special master to conduct an initial review of the materials seized.   The court held a hearing on October 2, 2009, set an expedited briefing schedule, instructed the government to provide the sealed affidavits to the court for review *in camera*, and issued a TRO (effective October 2, 2009, at 5:00 p.m.) precluding the government's review of the seized materials pending the court's decision on the motion.   The court also notified the Madisons that they lacked standing to challenge the seizure of property belonging to their housemates and that there may be a conflict of interest in the Madisons' attorney representing all petitioners.   Shortly thereafter, the remaining petitioners obtained separate counsel and became parties to this action.   After briefing was complete, on October 16, 2009, the court held oral argument on the petition.   At the oral argument, the court denied petitioners' request to have the Warrants' supporting affidavits unsealed on the ground that unsealing them could compromise the ongoing grand jury investigation.   (Oral Argument Tr. 31.)   The court also held that the search warrant affidavits set forth sufficient probable cause for the issuance of the Search Warrants and for the seizure of all the computers and other electronic equipment found at the Premises. (Oral Argument Tr. 32.)

## DISCUSSION

The Madisons act as lead petitioners in this action.   They challenge two aspects of the search and seizure.   First, the Madisons claim that the Warrants failed to particularly describe the items to be seized.   Second, they claim that the seizures were overbroad.   The Madisons also contend that many of the seized materials are protected by the First Amendment and the attorney-client and social worker privileges.   The non-Madison petitioners also raise their own arguments.   Petitioner Sobolewski argues that the government must provide the court with a non-

conclusory basis to justify the continued retention of her property.[6]   Petitioner Wallschlaeger argues that probable cause was insufficient to seize his belongings, relying on a line of Supreme Court cases dealing with the seizure of purportedly obscene materials.   The Weisses argue that their possessions should be returned because the government has made no showing that they, or their property, have any connection to the investigation.   At various points, individual petitioners have also chosen to adopt certain arguments made by their fellow petitioners.

The government opposes petitioners' motions, arguing that: (1) the court should defer ruling on petitioners' Rule 41(g) motion unless petitioners make a showing of irreparable harm, which they cannot do, (2) the Warrants described the items to be seized with sufficient specificity to permit the rational exercise of judgment by the JTTF agents executing the search, (3) the seizures were not overbroad, (4) the appointment of a special master is unnecessary because petitioners' First Amendment and privilege claims are meritless, (5) it need not justify its "continued retention" of the petitioners' property at this point, (6) probable cause was sufficient for the seizures, and (7) it need not make a showing that the Weisses are connected to anything unlawful.

For the reasons set forth below, petitioners' motion is denied in its entirety and the TRO is lifted, with certain conditions.   *See infra* CONCLUSION pp. 31-32.

---

[6] At the oral argument, the court was notified by the government and Sobolewski that an agreement had been reached concerning the appropriate disposition of the NORC laptop seized from the Premises.   Accordingly, neither Sobelewski's standing to challenge this particular seizure, nor its propriety, need to be decided as the issues relating to this laptop are moot.

I.      **Federal Rule of Criminal Procedure 41(g)**

Rule 41(g)[7] provides that, on a motion to return property, "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." FED. R. CRIM. P. 41(g).  "To prevail on a [Rule 41(g),] motion, a [petitioner] must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended." *Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005) (quoting *United States v. Van Cauwenberghe*, 827 F.2d 424, 433 (9th Cir. 1987)).

a.      **Deferral of Ruling**

The threshold issue, raised by the government and ignored by petitioners, is whether the court should rule on petitioners' Rule 41(g) motion prior to indictment absent a showing of irreparable harm.  As the government points out, courts have held that, in the absence of a showing of irreparable harm, a decision on a Rule 41(g) motion should be deferred until after an indictment has issued. *See, e.g., United States v. Douleh*, 220 F.R.D. 391, 397 (W.D.N.Y. 2003).

Under the version of Rule 41 in effect from 1944 to 1989, granting a motion for the return of property *required* the suppression of that property at any subsequent hearing or trial.[8] *See Doane v. United States*, No. 08 Mag. 0017 (HBP), 2009 WL 1619642, at *7 (S.D.N.Y. June 5, 2009) (citing FED. R. CRIM. P. 41(e) (1989)).  Therefore, under the old version of the Rule, granting the motion pre-indictment would have had the effect of suppressing evidence before the grand jury in derogation of the holding in *United States v. Calandra*, 414 U.S. 338 (1973). *See*

---

[7] Rule 41(g) was previously designated as 41(e), and was amended without substantive change in 2002. *See Adeleke v. United States*, 355 F.3d 144, 147 n.1 (2d Cir. 2004).

[8] Under the version of Rule 41(e) in effect prior to the 1989 amendment, if "the motion [for the return of property] is granted the property shall be restored and it *shall not be admissible in evidence at any hearing or trial*." FED. R. CRIM. P. 41(e) (1989) (emphasis added).

*Doane*, 2009 WL 1619642, at *7 ("The principal reason offered by these courts for engrafting an irreparable harm requirement onto the language of Rule 41(e) was that a pre-indictment suppression motion would unduly interfere with the function of the grand jury.").  "As a result, many courts deferred pre-indictment Rule 41(e) motions unless a movant could show (1) the search was illegal, (2) that he is without an adequate remedy at law, and (3) that he would suffer some irreparable injury if relief is not granted." *Id.* (citations ommitted).

Rule 41 was amended in 1989 to provide that "[i]f the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings." *Id.* (quoting FED. R. CRIM. P. 41(g)). This change was intended to "(1) keep pace with new developments in the exclusionary rule allowing the Government to retain and utilize unlawfully seized evidence in certain circumstances (i.e. grand jury proceedings) and (2) achieve a more equitable balance between the Government's law enforcement interest and the property rights of owners." *Id.*  Thus, as a result of the new language of Rule 41, granting a pre-indictment motion for the return of property no longer inevitably results in the suppression of the property in subsequent proceedings.[9] Moreover, in light of the reasonable conditions that may be imposed to preserve the use of the property, the government's conclusory assertion that consideration of this motion at this juncture would interfere with the grand jury investigation is unavailing.  Accordingly, petitioners need not establish irreparable harm for the court to consider their motions at this time.

---

[9] Notably, Rule 41(h) permits a defendant to move to suppress evidence in the court where the trial will occur as provided in Rule 12. FED. R. CRIM P. 41(h).

**b.  Legality of the Government's Search**

**1.  Special First Amendment Considerations**

"[W]hile the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), it is otherwise when materials presumptively protected by the First Amendment are involved." *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989) (citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 n.5 (1979)).  Petitioner Wallschlaeger argues that his possessions are protected by the First Amendment and, therefore, the seizures of those items pursuant to the Warrants were unlawful.

Wallschlaeger relies principally upon a line of Supreme Court cases dealing with the large-scale confiscation of purportedly obscene books and films. *See Marcus v. Search Warrant*, 367 U.S. 717 (1961) (invalidating the seizure of approximately 11,000 copies of 280 allegedly obscene publications where warrant gave police virtually unlimited authority to seize materials they considered to be obscene); *A Quantity of Copies of Books v. Kansas*, 378 U.S. 205 (1964) (invalidating the seizure of 1,715 copies of 31 allegedly obscene novels where warrant authorized seizure of materials that had not been found obscene); *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989) (invalidating the seizure of thousands of books and films based solely on probable cause).  Generally speaking, these cases stand for the proposition that probable cause to believe that a legal violation has occurred is insufficient to prevent the circulation of presumptively protected expressive materials.  Instead, in order to combat the risk of improperly restraining constitutionally protected expression, such restraints must be preceded by an adversary hearing on the grounds for the seizure. *See Fort Wayne*, 489 U.S. at 66-67.

Wallschlaeger has not made any showing that he is entitled to the protections afforded by *Marcus* and its progeny.  As an initial matter, these cases dealt with searches for, and seizures of, materials *because of* the materials' expressive content (*i.e.*, to stifle the particular expression).  *See Fort Wayne*, 489 U.S. at 65 ("It is incontestable that these proceedings were begun to put an end to the sale of obscenity at the three bookstores named in the complaint, and hence we are quite sure that the special rules applicable to removing First Amendment materials from circulation are relevant here.").  Here, the searches and seizures were not undertaken to stifle any type of expression. *See id.* at 63 ("seizing films to destroy them or to block their distribution or exhibition is a very different matter from seizing a single copy of a film for the *bona fide* purpose of preserving it as evidence in a criminal proceeding") (quoting *Heller v. New York*, 413 U.S. 483, 492 (1973)).  On the contrary, the searches and resulting seizures were undertaken to further an investigation into possible violations of the federal anti-rioting statute.[10]  Additionally, unlike the seizures in *Marcus* and its progeny, which are without a doubt "speech," Wallschlaeger has not pointed to the specific seizure of expressive material that is presumptively protected by the First Amendment.  Wallschlaeger's Affidavit lists the following seized items: a laptop computer, an external hard drive, a cell phone (along with its power cord and memory card), business records (including carbon copies of cancelled checks), two digital audio recorders, and three flags. (Wallschlaeger Aff. ¶ 3.)  However, Wallschlaeger fails to explain how any of these materials are presumptively protected.  Petitioner perhaps could have done so, for example, by specifically referring to expressive content stored in the electronic devices, or asserting that the "three flags" conveyed a message presumptively protected by the First Amendment.  Even assuming that Wallschlaeger had made a sufficient showing as to the seizure of presumptively

---

[10] 18 U.S.C. § 2101.

protected material, there has been no showing (nor argument) that any seizure qualifies as the type of "prior restraint" that the Supreme Court has cautioned against. *Fort Wayne Books*, 489 U.S. at 63 ("a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause" but "may not be taken out of circulation completely" before an adversary hearing) (citing *Heller*, 413 U.S. at 492-93).[11]   Accordingly, the Wallschlaeger seizures did not violate the First Amendment.

To the extent the other petitioners have adopted this line of cases in support of their motions, their arguments are rejected for the same reasons.  The searches and seizures were not undertaken to stifle any type of expression.   Moreover, petitioners have either failed to specifically allege the seizure of presumptively protected material, failed to make a sufficient showing of prior restraint, or both.[12]

## 2.  <u>Fourth Amendment Requirement of Particularity</u>

The Fourth Amendment requires that warrants "particularly describe[e] . . . the persons or things to be seized." U.S. CONST. amend. IV.  "This particularity requirement serves three related purposes: preventing general searches, preventing the seizure of objects upon the mistaken assumption that they fall within the magistrate's authorization, and preventing the issuance of

---

[11] Notably, the court has reviewed the sealed affidavits submitted in support of the search warrant applications and finds that there was sufficient probable cause to believe that evidence relating to violations of the federal anti-rioting statute may be found in the information or data stored in the computers and other electronic devices seized from the Premises.  The other items set forth in the Riders to the Search Warrants are also relevant evidence in light of the information contained in the search warrant affidavits.

[12] Regarding the fifty copies of a book written by Mr. Madison, et al., (a.k.a. "The Curious George Brigade"), entitled *Anarchy in the Age of Dinosaurs*, the court notes that the Madisons did not "adopt" this line of cases in support of their motion.  Nevertheless, the court finds that there has been no showing that this seizure is violative of the First Amendment.  Even so, the government has represented that, as soon as it is permitted to review the books, it will retain only one copy and return the remainder to the Madisons.  The government is urged to proceed with this review and return the excess books as soon as it is practical.

warrants without a substantial factual basis." *United States v. Young*, 745 F.2d 733, 758-59 (2d Cir. 1984) (citing 2 W. LA FAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 4.6 (1974 and 1984 Supp.)).  A warrant is sufficiently particular if it "enable[s] the executing officer to ascertain and identify with *reasonable certainty* those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992) (emphasis added) (citing cases).

Petitioners argue that reference to the anti-rioting laws in the Warrants was vague and, therefore, the Warrants failed to particularly describe what was, and was not, authorized to be seized.[13]  Perhaps if the referenced criminality had been indicated in truly vague terms, such as "fraud" or "conspiracy," petitioners' argument *might* have been more persuasive.  In such a case, the suspected criminality would be unclear, and could have represented a violation of any one of a number of federal statutes.  However, the reference to the federal anti-rioting laws in the Warrants results in no such ambiguity. The suspected criminality of rioting has a readily

---

[13] Petitioners also rely on the "proof of the pudding" test to demonstrate that the Warrants were insufficiently particular. (Madison Reply at 3-7.)  The court's search for a case setting forth the "proof of the pudding" test was unavailing.  Apparently, petitioners were referring to the old proverb, "the proof of the pudding is in the eating," whose origins date to 1615 when Miguel de Cervantes published *Don Quixote*. *See* JOHN BARTLETT, BARTLETT'S FAMILIAR QUOTATIONS 150 (Justin Kaplan ed., Little Brown and Co., 16th ed. 1992) (1855).  The meaning of this phrase may be summed up as: results are what counts.  According to petitioners, the results of the search (*i.e.*, what the agents did seize, as well as what they did not seize), should inform the court's analysis of the particularity of the warrant.  Even assuming petitioners are correct, the vast majority of items seized were authorized under the Warrants.  Regarding what was not seized, using petitioners' logic, the court must take note of the fact that the agents *did not seize* samurai swords, machetes, fencing rapiers, daggers, and other such items, as these items did not appear to constitute "rioting tools" that the agents were authorized to seize pursuant to the Second Warrant.  This exercise of judgment and restraint indicates that the agents were able to reasonably determine what was, and was not, authorized to be seized under the Warrants.  This restraint also reflects the reality that the agents were well trained, and that the criminality of rioting is not vague, but instead provided useful guidance to the executing agents in conducting the search.  Accordingly, the "proof of the pudding" test does not support petitioners' position.

ascertainable and reasonably specific meaning.[14]   It is also significant that there is only one

federal anti-rioting statute.  The federal anti-rioting statute prohibits the use of the channels and

instrumentalities of commerce to incite, encourage or participate in a riot, which is defined in

part as "an act or acts of violence . . . which . . . constitute a clear and present danger of, or . . .

result[s] in, damage or injury to the property . . . or . . . person of any other individual." 18

U.S.C. §§ 2101-2102.  To be sure, it is a broad criminal statute that prohibits a wide variety of

conduct.  However, it provides more than adequate notice as to the conduct that is prohibited by

its terms.  *See United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), *cert. denied*, 410 U.S. 970

(1973); *National Comm. v. Foran*, 411 F.2d 934 (7th Cir. 1969).   Thus, reference to the

criminality of rioting was sufficient to provide context to the Warrants.   Moreover, the

particularity inquiry must naturally focus on the effect of the terms of a warrant upon the

executing agents, *i.e.*, whether *agents* can reasonably understand and implement a warrant's

terms, not the untrained, general public.  The executing law enforcement officials were entitled

to use their experience in investigating such criminal activity to make rational and informed

judgments as to whether a particular item was related to rioting activity.[15] *United States v. Riley*,

---

[14] Notably, the Second Warrant set forth certain examples of rioting tools, providing the JTTF agents with yet another aid in determining what they were authorized to seize pursuant to the Second Warrant.   It is also noteworthy that the search warrant affidavits specifically described the tools and means used to engage in the prohibited conduct and otherwise satisfied the elements of the statute.

[15] Petitioners also contend that prosecutions under the statute have not taken place since the 1970s, and therefore, an "otherwise untrained" agent executing these warrants would not know that the anti-rioting statute prohibits the use of "oral or written (1) advocacy of ideas or (2) expression of belief, not involving the advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts," as evidence in a prosecution under the statute. 18 U.S.C. § 2102(b).  This argument is rejected for a number of reasons.  First, contrary to petitioners' contention, the court is aware of at least one prosecution under the statute that occurred in 1990. *See United States v. Markiewicz*, 978 F.2d 786 (2d Cir. 1992).   Second, petitioners presume too much.  There is no reason to assume that the executing agents would be untrained; in fact, there is every reason to assume the contrary. *See, supra* note 13; (Oral

906 F.2d 841, 844-45 (2d Cir. 1990) (officer executing search warrant permitted to exercise judgment as to whether particular document or item was within the described category for which seizure had been authorized).  It must also be remembered that, as a practical matter, there is no way to completely eliminate the exercise of discretion in the execution of a warrant. *United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir. 1970) (courts have recognized that executing agents must have as a practical matter "some discretion . . . to interpret the words of every warrant no matter how particularly the items to be seized are described").  Accordingly, the notion that the references to the suspected criminality in the Warrants were insufficient to limit the agents' discretion is rejected.

Even assuming, *arguendo*, the references to the suspected criminality in the Warrants were vague, petitioners cite no authority for the proposition that such a reference would render the Warrants insufficiently particular.  Indeed, the Fourth Amendment does not require a warrant to state with particularity the suspected criminality. *See United States v. Horn*, 187 F.3d 781, 787 (8th Cir. 1999).  It is true that, in certain circumstances, general criminal activity mentioned in a warrant, in and of itself, is insufficient to provide reasonable certainty as to the items to be seized. *See George*, 975 F.2d at 76 ("*Mere* reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize.") (citations omitted) (emphasis added).  However, as

---

Argument 28.)  Lastly, petitioners mischaracterize the statute.  The statute does not prohibit the use of the above cited evidence in a prosecution; rather, it provides that such evidence, *standing alone*, shall not be sufficient to constitute a violation of the statute. *See* 18 U.S.C. § 2102(b); *Cf. United States v. Parr*, 545 F.3d 491 (7th Cir. 2008) (portions of *The Anarchist Cookbook* admitted at trial as evidence against defendant for threatening to use a weapon of mass destruction); *United States v. Jimenez*, 507 F.3d 13 (1st Cir. 2007) (portions of *The Anarchist Cookbook* admitted at trial as relevant to identity theft).  Thus, knowledge of the "nods" to the First Amendment in the statute need not govern the execution of the search. (Oral Argument Tr. 47.)

discussed in greater detail below, the Warrants at issue included significantly more than a "mere" reference to general criminal activity.  The Riders contained approximately fifteen categories of items, the seizure of which the Magistrate Judge properly determined to be supported by probable cause and rationally connected to the suspected criminality of rioting.

Generally speaking, the items listed in the Riders fall into three categories: electronic devices; records and documents; and other tangible items.  Regarding the electronic devices, the Warrants authorized the seizure of "[c]omputers, hard-drives, floppy discs and other media used to store computer-accessible information, cellular phones, personal digital assistants, electronic storage devices and related peripherals . . . ."  Petitioners argue that the executing agents had no way of differentiating between electronic devices (or the material stored on those devices) that were, and were not, authorized for seizure by the Magistrate Judge. (Oral Argument Tr. 31-32.) This contention has no merit.

One of the main purposes of the particularity requirement is to ensure that the breadth of a search is reduced to "that which a detached and neutral magistrate has determined is supported by probable cause." *George*, 975 F.2d at 76 (citing cases).  As the court noted above, and at the oral argument on these motions, the sealed affidavits provided ample probable cause for the seizure of all the electronic devices at the Premises. (Oral Argument Tr. 32.)  By directing the agents to seize all of these items, the Magistrate Judge, rather than the agents, decided that they were to be seized because of the probability that they either were used to facilitate the alleged criminality, or might contain evidence of that criminality.   Additionally, given the nature of the investigation at issue, it is hard to imagine how the government could have reasonably described these items with any more specificity than was done, or that such added specificity (if available) would have reasonably assisted the agents in executing the search. *See Young*, 745 F.2d at 759

14

("courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances").  As the government noted at the oral argument, if the Warrants had required the agents to determine with certainty, prior to seizure, whether the electronic devices constituted evidence related to the investigation, or whether any of the material stored therein could have assisted in proving the suspected criminal activities, the search of the premises would have taken *much* longer than sixteen hours. (Oral Argument Tr. 42.)   Accordingly, the description of these items did not violate the Fourth Amendment.

Concerning the records and documents, the Warrants authorized the seizure of "correspondence and other documents, financial records, notes, ledgers, receipts, papers, photographs, telephone and address books, identification documents, indicia of residency and other documents and records that constitute evidence of the commission of rioting crimes or that are designed or intended as a means of violating the federal rioting laws . . . ."  In determining whether a warrant authorizing the seizure of large numbers of documents is sufficiently particular, the Second Circuit has held that such a warrant is adequate if it sets forth generic classifications of the items to be seized, together with an illustrative listing. *George*, 975 F.2d at 78-79; *Riley*, 906 F.2d at 844-45.  According to the Second Circuit:

> Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.

*Riley*, 906 F.2d at 845.  In this case, the Search Warrants provided specific guidance as to the types of documents and records to be seized.  Although the Warrants authorized the seizure of a rather broad category of documents and records ("documents and records that constitute

evidence of the commission of rioting crimes"), the Riders also contained a clear and easily understood listing of the types of documents and records the Magistrate Judge had determined were seizable as evidence of the alleged criminal activity ("correspondence and other documents, financial records, notes, ledgers, receipts, papers, photographs, telephone and address books, identification documents, indicia of residency").  Accordingly, the Warrants provided sufficient guidance as to the documents and records to be seized.

The Warrants also authorized the seizure of certain other tangible items: "black masks and clothing, maps," and "hammers, pipes, and other rioting tools."  The court finds these items to be as particularly described as the circumstances reasonably allowed, and their seizure was amply supported by the probable cause set forth in the supporting affidavits.

The court finds that the Warrants herein do not violate the Fourth Amendment.  This is especially true in this instance because the Warrants referenced the specific illegal activity being investigated and provided an illustrative list of the items to be seized. *See United States v. Lake*, 233 F. Supp. 2d 465, 471 (E.D.N.Y. 2002) ("[G]eneric terms may be used to describe the materials to be seized so long as the warrant identifies a specific illegal activity to which the item related.") (citing *George*, 975 F.2d at 76.).[16]

---

[16] Wallschlaeger also argues that the Warrant was executed in the manner prohibited by the Supreme Court in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979).  In *Lo-Ji*, the Court considered the constitutionality of an "open-ended" search Warrant issued in connection with an investigation of a violation of New York's obscenity law.  The Warrant authorized the seizure of: "the following items that the court independently [on examination] has determined to be possessed in violation" of the obscenity law. *Id.* at 321-22.  Significantly, no specific items were listed or described following the authorizing statement. *Id.*  Instead, the issuing judge accompanied the law enforcement officers while they executed the search Warrant in an adult film and magazine store and made on-the-spot determinations as to whether specific items on the shelves of the store constituted obscene material. *Id.*  The search warrant was later amended to reflect the specific items seized. *Id.* at 324.  Wallschlaeger contends that the Warrants executed in this case authorized the agents to make similar on-the-spot determinations.  This argument is meritless.  As set forth in more detail above, the Warrants in this case allowed the agents to

### 3.  <u>Overbreadth of the Seizures</u>

Where a search exceeds the scope of a warrant, the normal remedy is suppression and return of those items, not invalidation of the entire search. *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988).  "[S]uppression of all evidence seized is not justified unless those executing the warrant acted 'in flagrant disregard' of the warrant's terms." *Id.* (citing cases).  "Government agents flagrantly disregard the terms of a warrant so that wholesale suppression is required only when (1) they effect a *widespread* seizure of items that were *not* within the scope of the warrant, and (2) do not act in good faith." *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal citations and quotation marks omitted) (emphasis added).  Petitioners have failed to meet these requirements.

The Madisons argue that the majority of the items were illegally seized by the executing agents by listing ostensibly legitimate, non-nefarious uses for the items.  For example, the Madisons assert that: (1) gas masks, gas mask air filters, leg pads, face masks, walkie talkies, pick-style hammers, etc., were maintained at the premises on behalf of a Community Emergency Response Team ("CERT") in which some of the residents allegedly participate; and (2) books about poison are reference materials for the fiction writings of Elliot Madison.  As the court noted at the oral argument, the mere fact that seized items have legitimate purposes does not eliminate the possibility that they may also be evidence of a crime.[17] (Oral Argument Tr. 34.) The seizure of these items was called for by the Warrants, amply supported by probable cause in the underlying affidavits, and their connection to the suspected criminality is readily

---

ascertain and identify with reasonable certainty those items that the Magistrate Judge had authorized them to seize.

[17] Conspicuously, petitioners have not asserted legitimate uses for the one pound of liquid mercury, caltrops, or rounds of ammunition (possibly for a .22 caliber firearm) seized from the Premises. (*See* Receipts attached to Madison Motion at 22, 24.)

ascertainable.  Thus, petitioners' argument regarding these items is unavailing.  The court finds that the items were legally seized.

The Madisons also point to a number of items seized by the agents whose connection to the suspected criminality is not necessarily immediately apparent.  Nevertheless, the majority of the items listed by the Madisons were authorized for seizure under one of the categories of items described in the Warrants (e.g., CDs and DVDs, photos, drawings, magazines, books, personal journal, letters, notes, guest books, notebooks, postcards, personal organizers, datebooks, cell phones, and documents, writings and other files stored on electronic media).  To the extent any of these items lack evidentiary value, such is not a basis for rendering the entire search, or even the individual seizures, illegal.  As noted above, if the agents had been required to determine to an absolute certainty whether each item seized was relevant to the investigation, the search would have taken an unreasonable amount of time (in which case petitioners would likely be protesting its temporal length).  This is particularly true in the context of documents and records—in both electronic and paper form—which require a greater degree of analysis than, for example, the caltrops that were seized at the premises.  Accordingly, these items were legitimately seized.[18]

Arguably, a *few* of the Madisons' seized belongings appear to fall outside the scope of the Warrants (*i.e.*, "Curious George" items, needlepoint depiction of Lenin, test tubes/vials, and the homeopathy kit).  The same overbreadth argument was made by the non-Madison petitioners.  Arguably, the "roll(s) of film" belonging to petitioner Sobolewski and the "three flags" belonging to petitioner Wallschlaeger seem to fall outside the scope of the Warrants.

---

[18] Of course, the fact that possibly non-responsive items intermingled with responsive items were lawfully seized does not necessarily mean that the government's continued retention of these items is justified.

Nevertheless, the seizures may still be lawful if the government can show that the items fall within an exception to the warrant requirement.  The government could do so by demonstrating that the incriminating nature of the items, as they relate to the ongoing grand jury investigation, was immediately apparent.  However, the TRO imposed by the court has prevented the government from reviewing the items seized at the Premises.  Therefore, its ability to adequately address the propriety of these seizures has been largely curtailed, and therefore, the return of those items at this point is inappropriate.

In sum, while the executing agents arguably may have exceeded the terms of the Warrants to a minor degree, it is difficult to ascertain the legality of those seizures at this time without permitting the government to review them.  Nevertheless, the vast majority of the items seized by the agents certainly fell well within one of the categories in the Riders.  Accordingly, the search conducted at the two Premises did not constitute a flagrant disregard of the Warrants' terms, nor is there any indication of bad faith in the execution of the Warrants.  Thus, any finding of illegality must be limited to the specific items that *impermissibly* fell outside the Warrants' authorization.  Based on the fact that the government has not had an opportunity to review the material and develop its position on this issue, the court will defer its ruling as to which of the above mentioned items, if any, were *impermissibly* seized.  If the government determines that the continued retention of these materials is warranted, petitioners may renew their Rule 41(g) motion as to the legality of *these seizures only*.  However, the parties are urged to make good faith efforts to resolve this issue without resorting to court intervention.

### c.  <u>Need For the Property As Evidence</u>

Petitioners further contend that the government must set forth a "non-conclusory" basis for its claim that the "continued retention" of the seized property is actually necessary to an

19

ongoing criminal investigation.[19]   When a Rule 41(g) motion is made before an indictment is

filed, but a criminal investigation is pending, the burden of proof is on the movant to establish

that the seizure was illegal and that the movant is entitled to lawful possession of the property.

*See In re Grand Jury Subpoena Duces Tecum*, 49 F. Supp. 2d 450, 453 (D. Md. 1999) (citing

*United States v. Martinson*, 809 F.2d 1364, 1369 (9th Cir. 1987)).  "However, when the property

in question is no longer needed for evidentiary purposes, the burden of proof changes." *Id.*

(quoting *Martinson*, 809 F.2d at 1369).  At that point, the movant is presumed to have a right to

the return of the property, and the government has the burden of establishing that it has a

legitimate reason for the continued retention of the property, *i.e.*, that it is contraband or subject

to forfeiture. *Id.* (citing *Martinson*, 809 F.2d at 1369).  In such a case, the legality of the search

or seizure is no longer an issue. *Id.* (citing *Martinson*, 809 F.2d at 1369).  However, the court

must bear in mind that, in determining a Rule 41(g) motion, it must engage in a balancing test

between the government's interest in the continued retention of the property and the owner's

right to its use.  *Id.* (citation omitted); *Krimstock v. Kelly*, 464 F.3d 246, 251 (2d Cir. 2006).  "In

striking this balance, courts need not order the return of lawfully seized property where the

government has a 'continuing interest' in the property." *Id.*  An ongoing grand jury investigation

is an appropriate continuing interest. *In re Grand Jury Subpoena*, 49 F. Supp. 2d at 453.

---

[19] The court notes that the government is not required to make a showing at this point that
the Weisses, or their property, are connected to the suspected wrongdoing.  The Agents were
entitled to seize any property belonging to the Weisses that fell within the description of items in
the Riders because the Warrants encompassed the entire Premises.  This reasoning applies with
equal force to petitioner Hasenbank to the extent it was raised at the Oral Argument. (Oral
Argument Tr. 40-41.)   Additionally, while the court is cognizant that the seizures may be
interfering with certain petitioners' ability to earn their livelihood, this fact, standing alone, is
insufficient to order the return of their property at this point.  Notably, the government has
expressed a willingness to return certain original computer equipment upon the petitioners
agreeing to the government duplicating it or its contents, and petitioners executing a stipulation
of authenticity.  To the extent that the parties can expeditiously work out such arrangements,
petitioners' ability to earn a livelihood can be speedily restored.

However, even if the government has a continuing evidentiary interest, it may not hold the property for an unreasonable amount of time without taking some action with regard to the property. *Id.* n.2 (citing *United States v. Carter*, 859 F. Supp. 202, 204-05 (E.D. Va. 1994)); *Krimstock*, 464 F.3d at 251.

Recognizing that perhaps not all of the items seized may be relevant to the investigation, the court issued the TRO one day after the search occurred in an effort to immediately protect petitioners' First Amendment concerns and asserted privileges. As such, the government has not had the opportunity, reasonable or otherwise, to determine which items are necessary to its investigation and, therefore, has not determined which items it needs to retain. The government has repeatedly noted that, as soon as it is permitted to do so, it will review all of the seized material and return any item that does not have evidentiary value. Accordingly, this issue is not ripe for decision, and is hereby denied as to all petitioners without prejudice. No case cited by the petitioners persuades the court otherwise, as they are either distinguishable, from outside this Circuit, or both. *See In re Smith*, 888 F.2d 167, 168 (D.C. Cir. 1989) ("district court must balance the interests of the government in holding the property against [movant's] interest"); *Interstate Cigar Co. v. United States*, 928 F.2d 221 (7th Cir. 1991) (property seized and held for over eighteen months without issuing a single indictment or seeking forfeiture, and with no indication that petitioner was a target of the investigation); *In re Grand Jury Subpoena Duces Tecum*, 49 F. Supp. 2d 451 (D. Md. 1999) (seeking the return of food products seized pursuant to the execution of a search warrant at petitioner's warehouse); *Krimstock v. Kelly*, 464 F.3d 246 (2d Cir. 2006) (while no adversarial hearing was necessary, prosecutor's unilateral decision to retain seized vehicle as evidence without a warrant required review by neutral fact finder). Petitioners may renew their Rule 41(g) motion as to *this issue* after the government has had a reasonable

opportunity to review the seized materials, verify its inventory pursuant to Federal Rule of Criminal Procedure 41(f)(1)(B), and determine that it needs to retain certain original evidence. The aforementioned cases make clear that the government may make reasonable efforts to enable the owner to use the property, such as providing copies to the owner.  As with the legality of certain seizures mentioned above, the parties are urged to make good faith efforts to resolve this matter without court intervention.

## II.   Special Master

Petitioners also urge the court to appoint a special master to conduct an initial review of the items seized to screen for First Amendment protected and privileged materials.  Though a special master has been authorized in other cases, the court finds that such a measure is not called for in this matter.   As discussed in greater detail below, the petitioners have failed to make a substantial showing of the existence of any First Amendment or privilege protection. Under these circumstances, the court finds that the government's normal reviewing mechanism will be adequate.

### a.   First Amendment Privilege

The Madisons argue that the "records of political associates, house guests and similar items" seized by the government that contain identifying information of "like-minded political anarchists" are protected by the First Amendment and, as such, the government's review of the materials will cause them irreparable harm. (Special Master Memo at 3.)  The government counters that it was not seeking a membership list as petitioners allege.  Instead, the government sought, and the Warrants authorized, the seizure of assorted documents and records constituting evidence of the commission of rioting crimes.  The government further contends that it has a

compelling interest in the documents seized because of its ongoing criminal investigation.  The court is unpersuaded by the Madisons' arguments.

The Madisons apparently rely on *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) ("*Patterson*"), in which the Supreme Court gave protection to the right now recognized as freedom of expressive association.  In *Patterson*, the Attorney General of Alabama brought suit (via a bill in equity) against the NAACP for violating a statute requiring a foreign corporation to qualify before transacting intrastate business by, *inter alia*, filing its corporate charter with the Secretary of State. *Id.* at 451-52.  For the purpose of preparing for an evidentiary hearing in the matter, Alabama moved for the production of documents that would disclose the names and addresses of all Alabama members and agents of the NAACP. *Id.* at 453.  Alabama alleged that the documents were necessary to prove that the NAACP conducted intrastate business within the meaning of the qualification statute.  Over the NAACP's objections, the court ordered the production of the membership lists. *Id.*  Thereafter, the NAACP filed its answer to the bill in equity, admitting its Alabama activities substantially as alleged in the complaint.  However, the NAACP refused to comply with the production order, and for this failure was held in civil contempt. *Id.*

The Supreme Court reversed the contempt judgment, holding that compelled disclosure of the membership lists pursuant to the qualification statute would likely impose a "substantial restraint" on the group's right to freedom of association. *Id.* at 462.  This finding was based upon the NAACP's "uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members ha[d] exposed th[ose] members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id.*  Under

these circumstances, the Court found it "apparent" that compelled disclosure of the membership

lists was:

> likely to affect adversely the ability of [the NAACP] and its members to pursue
> their collective effort to foster beliefs which they admittedly have the right to
> advocate, in that it may induce members to withdraw from the Association and
> dissuade others from joining it because of fear of exposure of their beliefs shown
> through their associations and of the consequences of this exposure.

*Id.* 462-63.   The Court then determined that Alabama had failed to demonstrate that the

membership lists had a "substantial bearing" on a compelling government interest. *Id.* at 465-66.

Thus, distilled to its essence, *Patterson* stands for the proposition that compelled

disclosure of information that would substantially discourage free association may only be

ordered by the government if it can demonstrate the information has a substantial relationship to

a compelling interest. *See Shelton v. Tucker*, 364 U.S. 479, 485 (1960) (concluding that, in the

*Patterson* case, "there was no substantially relevant correlation between the governmental

interest asserted and the State's effort to compel disclosure of the membership lists involved").

The Madisons' reliance on *Patterson* is misplaced.  The Madisons have not made any

showing—through argument or otherwise—that the government's review (or its disclosure to the

public) of the "identifying information" of "like-minded political anarchists" is likely to

adversely affect *their* ability to exercise their right to freedom of association.[20]   Thus, the

Madisons' claim fails for at least this reason.   Additionally, the government has set forth a

compelling interest in reviewing the information—the identification of individuals involved in

the alleged criminal activity that is the subject of an ongoing grand jury investigation.   Upon

---

[20] The court also notes that petitioners lack standing to assert First Amendment rights on
behalf of the "like-minded political anarchists" with whom they associate.  In *Patterson*, the
Court found that the NAACP was an appropriate party to assert the rights of its members because
those rights could not otherwise be effectively vindicated. 357 U.S. at 458-59.  Petitioners have
made no such showing, despite it being their burden to do so.

review of the search warrant affidavits, the court finds that there is a good faith basis for the government's position.   Indeed, "[t]he courts have regularly upheld warrants authorizing searches for evidence of association between and among participants in a criminal activity." *United States v. Regan*, 706 F. Supp. 1102, 1113 n.14 (S.D.N.Y. 1989) (citing cases). Interestingly, the Madisons appear to recognize this reality: "such materials might be leads to others involved in 'violations of federal anti-rioting laws.'" (Special Master Memo at 3.)   As *Patterson* makes clear, the *mere* fact that the associates may be "like-minded political anarchists" is insufficient to shield the information from seizure or review.   Accordingly, *Patterson* does not preclude the government's review.[21]

### b.  Attorney-Client Privilege

The Madisons also assert that some of the materials seized by the government *may be* covered by the attorney-client privilege.   They claim that, during the 2004 Republican National Convention in New York City, approximately 1,800 demonstrators were arrested and that, as part of the People's Law Collective, they "helped coordinate the legal services of over 100 volunteer lawyers who represented those arrested." (Elliot Madison Aff. ¶ 10; Elena Madison Aff. ¶ 5.) The Madisons further claim that in "some" of those cases, they "participated in legal strategy sessions with lawyers and their clients" in order to help "prepare [those] cases for trial or other disposition." (*Id.*)   The government argues that the Madisons' assertions are insufficient to establish the existence of the privilege.   Perhaps the best recitation of the government's position was presented by the Assistant U.S. Attorney at the Oral Argument:

> The Madisons' claim on the attorney-client privilege is really entirely speculative.
> In the reply brief Mr. Stoler filed, he says that the Madisons may very well have
> participated in the attorney-client communications.  So we don't know whether

---

[21] To the extent the non-Madison petitioners have "adopted" this argument, it is rejected for the same reasons.

they, in fact, did.  If they did, we don't know whether any records of those communications were created.  If they participated in the conversations and records were created, we don't know whether the Madisons kept those at their home.  If they participated in the conversations and the records were created and they were kept in their home, we don't know whether any agents seized them.  It's just not sufficient.

(Oral Argument Tr. 15-16.)  The court concurs with the government.  The Madisons have failed to (a) show that they are even entitled to assert the attorney-client privilege, and (b) identify any documents or materials that may be protected by the privilege.

As an initial matter, the Madisons concede that they are not attorneys. (Elliot Madison Aff. ¶ 10; Elena Madison Aff. ¶ 5.)  However, this does not end the matter because "[t]he privilege must include all the persons who act as an attorney's agents." *Von Bulow ex rel. Auersperg v. Von Bulow*, 811 F.2d 136, 146 (2d Cir. 1987) (citations omitted).  Thus, in order to justify the appointment of a special master, the Madisons must demonstrate a *sufficient likelihood* that the government seized materials which reference communications made to them, in confidence, in their capacity as agents of an attorney, for the purpose of obtaining legal advice from that attorney. *Id.* at 146.  The Madisons have not done so.  The Madisons have failed to identify any attorney that they purportedly worked with, any specific cases on which they worked, or the reasons for participating in the purported "legal strategy sessions." (Elliot Madison Aff. ¶ 10; Elena Madison Aff. ¶ 5; Gov't Opp'n Ex. L.)[22]  Thus, the Madisons have utterly failed to substantiate their claim that they were privy to privileged attorney-client communications.

Even if the Madisons had been privy to such communications, the Madisons have failed to identify any records that memorialized any of these communications.  It follows then, that the

---

[22] To the extent the Madisons try to base their claim of attorney-client privilege on their affiliation with the People's Law Collective, the court is unmoved.  A web description of the PLC prominently notes that its staff members are *not* attorneys. (Gov't Opp'n Ex. L.)

Madisons have not demonstrated a sufficient likelihood that specific purportedly privileged documents were seized.   Indeed, petitioners concede that their application is made "speculatively." (Oral Argument Tr. 11.)   In short, the Madisons have chosen to rely upon the very type of "*ipse dixit*" assertions the Second Circuit has rejected and, therefore, the appointment of a special master to conduct a review for attorney-client privileged material is unnecessary. *Von Bulow*, 811 F.2d at 146-47 (refusing to recognize the privilege where the proponent had not given the name of a specific attorney, nor explained the reasons for her attendance at legal strategy sessions).

The only case cited by petitioners on this issue, *United States v. Stewart*, 02-CR-396 (JGK), 2002 WL 1300059 (S.D.N.Y. June 11, 2002), does not compel a different result.  Stewart was a criminal defense attorney indicted in the Southern District of New York for committing various crimes in the course of her representation of a client prosecuted in that district. *Id.* at *1-2.   The day after Stewart's indictment, members of the JTTF executed a search warrant at Stewart's law office, which was part of a suite shared with four other solo practitioners, all of whom specialized in criminal defense work, and who had open and closed cases prosecuted by the United States Attorney's Office for the Southern District. *Id.* at *2.   During the course of the search, agents seized various materials from the suite, including a computer that had been used by Stewart and the other resident attorneys to prepare legal documents and attorney work product. *Id.* *2-3.   In light of these "extraordinary circumstances," the court appointed a special master to perform an initial review of the seized materials for privilege.

The "extraordinary circumstances" that warranted the appointment of a special master in the *Stewart* case simply are not present here.   In the *Stewart* case, there was no question that privileged materials likely existed among the items seized.   The issue before the *Stewart* court

was how the initial review for such privileged material should proceed (*i.e.*, by way of a government privilege team or a special master), not whether such a review should be conducted. *Id.* at *4. Here, by contrast, there is no such overwhelming likelihood. Indeed, the likelihood is quite slim to non-existent. The court is not presented with the search of a suite of law offices, but rather the search of the home of non-attorneys. Moreover, as detailed above, the Madisons cannot identify either attorneys or clients they worked for, or the documents or items that purportedly fall under this privilege. Additionally, there has been no showing that the United States Attorney's Office for the Eastern District of New York is currently prosecuting any of the individuals to whom the privilege could conceivably belong. Accordingly, petitioners' motion is denied on this ground.

### c. Social Worker Privilege

Mr. Madison also argues that some of the seized materials are protected by the social worker privilege. In *Jaffe v. Redmond*, 518 U.S. 1, 15 (1996), the Supreme Court recognized a federal psychotherapist-patient privilege that also extends to "confidential communications made to licensed social workers in the course of psychotherapy." Mr. Madison concedes that he is not a *licensed* social worker. (Special Master Memo at 2.) Nevertheless, Mr. Madison claims that his duties at Fountain House are identical to those of someone with such a license and, therefore, he should be entitled to claim the social worker privilege on his clients' behalf. The government counters that the privilege should not be extended to unlicensed social workers and that, even if it were, it still would not extend to any materials prepared by Mr. Madison because neither he, nor Fountain House, provides clinical treatment to Fountain House's clients. (Oral Argument Tr. at 22; Gov't Opp'n Ex. O.)

Federal Rule of Evidence 501 authorizes federal courts to define new privileges by interpreting common law principles "in the light of reason and experience." "The Rule thus did not freeze the law governing the privileges of witnesses in federal trials at a particular point in our history, but rather directed federal courts to 'continue the evolutionary development of testimonial privileges.'" *Jaffe*, 518 U.S. at 8-9 (quoting *Trammel v. United States*, 445 U.S. 40, 47 (1980)). In *Jaffe*, the Supreme Court reiterated that "the policy decisions of the States bear on the question whether federal courts should *recognize a new privilege or amend the coverage of an existing one*." *Id.* at 12 (emphasis added). Accordingly, in extending the psychotherapist privilege to *licensed* social workers, the Supreme Court relied, in part, on the fact that the "vast majority of States explicitly extend a testimonial privilege to *licensed* social workers." *Id.* at 16-17. (emphasis added). New York's statutory social worker privilege applies *only* to *licensed* social workers. N.Y. C.P.L.R. § 45-8(a); *see also Shane MM v. Family and Children Services*, 280 A.D.2d 699 (3rd Dep't 2001) (citing Alexander, Practice Commentaries, McKinney's Cons. Laws of N.Y., Book 7B, CPLR § 4508, at 14); *Humberstone v. Wheaton*, 21 A.D.3d 1416 (4th Dep't 2005). New York's express public policy determination in this regard is most persuasive. Mr. Madison has not provided any reason for the court to reject it. Accordingly, the court declines Mr. Madison's invitation to extend the social worker privilege to cover communications made to unlicensed social workers.

Mr. Madison's privilege argument also fails because the Supreme Court limited the privilege to social workers engaged in psychotherapy. This limitation was based on the rationale that the effective treatment of mental or emotional problems served sufficiently important public interests to justify an exception from the general rule disfavoring privileges. Thus, the Court recognized the distinction between the types of communications made to a social worker in the

course of *clinical evaluation and treatment* ("psychotherapy"), and other communications that do not qualify as therapeutic, including discussions about such matters as the client's housing, employment, family, or benefits programs ("counseling").  Only the former are protected by the *Jaffe* privilege.  Mr. Madison concedes that he does not perform psychotherapy or treatment. (Oral Argument Tr. 22.)[23]  Instead, Mr. Madison appears to provide counseling on a variety of "life" topics, such as, obtaining social services (*e.g.*, S.S.D.I., Medicaid, Medicare) and preparing documentation for housing programs (*e.g.*, U.S. Dep't of Housing and Urban Dev.).  (Elliot Madison Aff. ¶ 4; Madison Reply at 8.)  Assuming that an environment of confidence and trust is essential for Mr. Madison to effectively perform these important functions, they do not serve "a public good of transcendent importance" such that they "outweigh the need for probative evidence." *Jaffe*, 518 U.S. at 9-12; (Elliot Madison Aff. ¶ 4).

In short, the court declines to extend the social worker privilege's scope on these facts and, as such, the appointment of a special master is unnecessary.[24]

---

[23] This was also corroborated by the affidavit of Special Agent Edward J. Heslin.  On October 7, 2009, Special Agent Heslin conducted an interview of Kenneth Dudek, the President of Fountain House. (Gov't Opp'n Ex. O.)  Mr. Dudek explained to Special Agent Heslin that Fountain House does not provide clinical treatment to its clients.

[24] Notably, the government has represented that if any Fountain House records are uncovered in its review, those records will be returned.  The court again urges the government to do so as expeditiously as possible.

## **CONCLUSION**

For all the foregoing reasons, petitioners' motions for the return of their property or the appointment of a special master are denied in their entirety. The Warrants issued by Magistrate Judge Pohorelsky were sufficiently particular and in compliance with the First Amendment. Moreover, the seizures at the Premises did not constitute a flagrant disregard of the Warrants' terms, nor is there any indication that the agents acted in bad faith in their execution. The TRO imposed by the court prevented the government from reviewing the items seized at the Premises, thereby limiting its ability to adequately address the propriety of certain seizures that arguably may fall outside the scope of the Warrants. Thus, the return of those items at this point is inappropriate. The court defers its ruling as to which of the specifically mentioned items (*i.e.*, "Curious George" items, "needlepoint depiction of Lenin," "test tubes/vials," "homeopathy kit," "roll(s) of film," and "three flags"), if any, were *impermissibly* seized until after the government has had the opportunity to inspect them. If the government determines that the continued retention of these materials is warranted, petitioners may renew their Rule 41(g) motion as to the legality of *these seizures only*. Regarding the continued retention of the other property seized from the Premises, the TRO also has prevented the government from determining which items it needs to retain. Therefore, this issue is not ripe for decision, and is hereby denied as to all petitioners without prejudice. The petitioners' motions for the appointment of a special master is denied because of the failure to set forth a substantial showing that the government's review will endanger any legally recognized privileges or the petitioners' rights under the First Amendment.

Accordingly, the TRO initially issued by the court on October 2, 2009 and extended on October 16 and 26, 2009, is lifted. The government is directed to expedite its review and assessment of the evidentiary value of the seized items, and return to petitioners, on a rolling

basis, the following items: (1) items without evidentiary value, (2) copies of original documents the government seeks to retain, and (3) as to computers and other electronic hardware, original items as soon as forensic copies are created and the owners execute stipulations attesting to the authenticity of the copies.   The government shall not return those items it believes to be contraband.  The government is further directed to provide to petitioners and file with the court, a detailed inventory of the seized property.  Lastly, the government is directed to provide the court and petitioners with a status report as to the progress of its compliance with the court's Order on or before November 30, 2009.

SO ORDERED.

Dated: Brooklyn, New York
　　　November 10, 2009

/s/
_____
DORA L. IRIZARRY
United States District Judge